S. M. ASBURY v. R. G. FAIR et al.

*Trespass on Land—Title—Grant—Evidence—Insanity—
Limitation—Privity—Possession.*

1. When neither claimant is seated on the lappage in dispute, and when both are on it, the law adjudges the possession to follow the older title.

2. Seven years possession and cultivation of land under a junior grant makes title against an older one; and where there was evidence from which such possession could be found, it was error to hold that plaintiff (claiming under the junior grant) could not recover.

3. The statute of limitations, if it began to run before the commencement of insanity, or other disability, would not, on that account, cease, and when there was any testimony from which such a state of facts could be found, their consideration should not have been withdrawn from the jury.

4. Under the law in force, no connection need be shown between the successive occupants to establish the presumption of a grant for the actual *possessio pedis.*

5. Insanity is a question for the jury; and even where the testimony as to the *fact*, while not directly disputed, was capable of more than one construction, it was not proper to withdraw it from the jury.

6. Privity of estate between the plaintiff, and those under whom be claims, is not necessary to entitle him to the advantage of their possession to show title by the statute of limitation.

7. Statute of limitations need not be pleaded specially to show title.

8. Unless the defendants connect themselves with their elder grant, it serves them no purpose, except to take title out of the State, and in this it is of equal avail to the plaintiff also.

This was a CIVIL ACTION of trespass on land, to try title, and for damages, tried at Fall Term, 1892, of BURKE Superior Court by *Armfield, J.*

The following issues were submitted:

1. Did the defendants commit the trespass alleged in the complaint on the lands of plaintiff described in the complaint?

2. What damage has plaintiff sustained by reason of said trespass?

Plaintiff offered a deed from D. W. Stacy to S. M. Asbury, dated 16th June, 1890.

A deed from Jos. Brittain, Sheriff, to D. W. Stacy, dated January 28, 1869; to which defendants object.

A deed from Joseph Ferree, trustee, to D. W. Stacy, dated 23d May, 1856.

A deed from John H. Pearson, Sheriff, to Jamison Queen, dated 20th February, 1852; to which defendants object and except.

Grant from the State to William B. Craig and Mark Brittain, dated 4th September, 1818, and entered 30th September, 1817.

Plaintiff introduced D. W. Stacy: " I am seventy-one years old; I moved to this county in 1837; settled on the land in 1856; my house was between 'I' and 'J;' I lived there and had possession till I sold plaintiff in 1890; made my garden in 1856; I had stables on the disputed land and a workshop; my predecessor, Jimson Queen, used it for a store-house; I moved off in 1872, but had tenant there till sold; some of the disputed land was partly cleared when I went there; I cleared some twelve or fifteen acres; part of it was in possession of Dale; I got my firewood off it; I got timber and sold it off the woodland; sold it to Presnell—thirty or forty of them off disputed land; all fit for timber; I used and treated disputed land as I did my own; Brittain deed and Ferree deed both cover the land in dispute; plaintiff lived in two hundred yards of land while I was using it."

On cross-examination, he said, among other things: " I don't think Dale was cultivating any of the lappage."

Jamison Queen: "I moved there in 1847, and built a house; I made a garden next year where the garden is now; about two years after I went there Dale had to be confined, chained; was not at himself when I went there; he went

about; then I built a storehouse on the lappage; I lived there four or five or six years; I did not know where the line of the Morgan grant of the Deal line was; built house and made garden in ignorance of its location; Dale culti- vated land on the lappage while I lived there; he had a part of the field under fence on lappage for years; he cultivated this after I left there; I don't know how long; it was cleared after I went there; Dale had been deranged before I went there, and when I went there he seemed scrambled, addled, and sometimes had pretty good sense."

The defendants then offered their grant of 1804, and evi- dence tending to support their possession thereunder.

When the evidence was closed, and the Court asked the counsel of plaintiff how they could get along when all the evidence showed that John Deal had been insane since 1847 or 1849, and that there had been a possession of his, or under him, since on the lappage, and that the mother of defendants, under whom they claim, had been a married woman continuously since Deal's death, Deal's title being the oldest and covering the land, plaintiff's counsel called the attention of the Court to the case of *Headen* v. *Womack*, and insisted that the insanity or coverture did not apply to this case, to affect plaintiff's title by possession in lappage. His Honor was of a contrary opinion and in deference thereto, and to the further intimation of his Honor that he should instruct the jury that no statute ran against defend- ants after Dale became insane, plaintiff suffered a nonsuit and appealed.

The other testimony necessary to the presentation of this case may be gathered from the opinion.

*Messrs. M. Silver* and *F. H. Busbee,* for plaintiff.
*Mr. S. J. Ervin,* for defendants.

AVERY, J.: The defendants offered a grant issued in 1804, and the plaintiff introduced one issued in 1818, both of which, according to the evidence, cover the twenty-three acres in dispute. The plaintiff offered other title deeds, but the defendants introduced none, so far as appears from the record. The testimony was conflicting as to whether the defendants, and those under whom they claim, ever had a possession on the lappage under the older grant or not, until they recently engaged in cutting trees thereon. D. W. Stacy testified that he did not think that John Dale, ancestor of defendant, had any clearing on it at all when the former took possession as predecessor of plaintiff in 1856, while Jamison Queen, the predecessor of Stacy, testified that Dale had cleared and had under fence a field on the lappage, while he occupied the house in which Stacy afterwards lived. Queen testified further that Dale cultivated this portion of the lappage for years, but did not state when such occupancy began or when it ended. Hezekiah Fair, the son-in-law of John Dale, testified to a continuous possession by John Dale from 1859 till 1869, when it was abandoned, and the rails around the field were hauled off by Stacy, the adverse claimant. So that if it was material to ascertain whether Dale had possession of any part of the lappage before he became insane, or at any other time, or how long he held it adversely, it should have been left to the jury to pass upon the conflicting evidence and arrive at the truth.

If neither of the claimants is seated on the lappage, the law adjudges the possession to be in him who has the older title—in our case John Dale, and those claiming under him, if they derived title through the Morgan grant, issued in 1804. If Queen, Stacy and plaintiff, claiming under the Brittain grant of 1818, were in possession of a part of the lappage, and John Dale, and those claiming under him, neither occupied nor cultivated any part of it (as Stacy testified), then the occupant under the junior title held con-

structively the whole interference. If both were cultivating some part of the lappage, then the possession of the true owner, who connected himself with the older grant, extended to all of the land not actually occupied by those claiming under the junior title. *McLean* v. *Smith*, 106 N. C., 172. Such occasional acts of ownership, as cutting and removing wood from land susceptible of cultivation, do not amount to an occupancy that will serve the purpose of maturing title in the occupant. *Ruffin* v. *Overby*, 105 N. C., 78.

The Judge assumed that a possession on the lappage in John Dale had been shown by all of the witnessess, but D. W. Stacy said explicitly, on his cross-examination, "I don't think Dale was cultivating any lappage." If the jury had found that the plaintiff, and those through whom he claimed, held adverse possession on the interference for seven years (while John Dale was cultivating no portion of it), then, if the statute was running, the plaintiff was entitled to recover, since it appeared that the land had been twice granted by the State, and that the deeds offered by plaintiff, executed respectively by Ferree to Stacy in 1856, and by Brittain to Stacy in 1869, covered the whole disputed boundary.

But it was contended, that in any aspect of the testimony, the jury must assume as an undisputed fact, not only that John Dale was insane but that he became insane before the statute began to run by reason of any adverse occupancy. The testimony, viewed in the most favorable light for the defendants, fails to sustain this contention. If the jury had reached the conclusion that Queen and Stacy held possession of a house or garden on the lappage, while neither Dale nor his tenants were occupying any part of it, and before Dale became insane (provided, always, they did actually find that he became incapable of understanding what he was doing, or what others were doing, in so far as their conduct affected

his rights), then the statute would not cease to run by reason of Dale's subsequent disability.

Stacy testified that Queen was his predecessor in the possession, though no evidence was offered to connect Queen directly with the (Craige & Brittain) junior grant, the jury were at liberty to connect his possession with that of Stacy, if Queen entered upon the lappage before Dale became insane, let Stacy into possession in his stead, and Stacy held the only possession on the lappage from 1856 to 1890, when plaintiff entered under the deed from him, or the only possession except that which, as Hezekiah Fair testified, began in 1859 and lasted till 1869, when it was abandoned, and the rails surrounding it were hauled off by Stacy (the statute being suspended from May, 1861, till January 1, 1870). This possession began when the old law was in force, and no connection need be shown between occupants for the purpose of establishing the presumption of a grant for the actual *possessio pedis.* So, as we shall see, there is abundant ground to contend that the thirty-year statute was running *pro tanto.* The Court had no right to assume that John Dale became *non compos mentis* at any given period. Queen testified that when he entered Dale was "scrambled, addled, and sometimes had pretty good sense." This testimony, if accepted as true, did not show beyond question the mental condition and capacity of Dale, and as it was the province of the jury to pass upon the credibility of, as well as draw such inferences from, testimony of this kind, as they thought proper, if believed, the Court erred in announcing the conclusion of fact that Dale was insane from 1847, or 1849, in presence of the jury, and the conclusion of law predicated upon the fact so found. It was even within the range of possibility that the jury would determine that there was no satisfactory evidence of Dale's insanity till after Stacy entered, and no satisfactory testimony of a possession by Dale on the lappage,

in which contingency Stacy's title would have matured in seven years from 1856.

But as the plaintiff might have relied in part, at least, upon actual possession for the statutory period commencing with Queen's entry in 1847, if the defendant subsequently entered upon territory presumptively so acquired by him, it was not necessary to show privity in estate between Stacy and Queen in order that the possession of both should be counted in determining, not only the question of trespass involved, but how to render judgment as to the whole lappage. *Candler* v. *Lunsford*, 4 Dev. & Bat., 407; *Melvin* v. *Waddell*, 75 N. C., 361; *Phipps* v. *Pierce*, 94 N. C, 514; *Freeman* v. *Sprague*, 82 N. C., 366; *Allen* v. *Salinger*, 103 N. C., 14.

The thirty-year statute of presumptions having begun to run if Dale was not shown to be *non compos mentis* until after Queen entered, it would seem that when Stacy was let into possession by Queen it would continue to run, certainly as to the actual *possessio pedis* to which Stacy succeeded as occupant.

It is not necessary to determine whether if the thirty year statute were running in favor of Stacy when he entered, he could extend the benefit of Queen's occupancy not only to the *possessio pedis* at the storehouse and stables, if it began when Dale was *compos mentis*, but to the whole lappage covered by his deed bearing date in 1856, though Dale had in the meantime become deranged and though no connection was shown between the proper titles of Stacy and Queen, but only the fact appeared that Stacy was let in under Queen, who claimed adversely to Dale. His Honor declared his purpose to tell the jury that "*no statute* ran against defendants after Dale became insane," and, as we have seen, if he became insane after Queen entered, the thirty-year statute was certainly put in motion.

It was not incumbent on plaintiff's counsel, as has been suggested, to point out in a labored argument how such

111—17

instruction would be erroneous. This is not a case where the evidence was voluminous, and the Judge having intimated upon the whole of the mass of testimony (as in *Gregory* v. *Forbes*, 94 N. C., 220, and *Holly* v. *Holly, Ibid,* 639) that the plaintiff could not recover, it became the duty of plaintiff's counsel to call the attention of the Court to some part of the evidence bearing upon some legal proposition; on the contrary, the Court not only declared a position taken by counsel to be untenable, but added that upon a review of the whole evidence he would tell the jury that in no view would any statute run after Dale became insane, thus narrowing the controversy to a single point. The Judge had his notes, presumably, before him, and had better opportunity than counsel for analyzing and determining its legal effect. We do not think that the plaintiff was precluded from taking advantage of errors unless his counsel then and there submitted an argument upon the facts and law, outlining in substance the ground we have taken. *Mobley* v. *Watts,* 98 N. C., 284; *Pescud* v. *Hawkins,* 71 N. C., 299; *Tiddy* v. *Harris,* 101 N. C., 589; *Warner* v. *Railroad,* 94 N. C., 250; *Gibbs* v. *Lyon,* 95 N. C., 146; *Springs* v. *Schenck,* 99 N. C., 551. In view of all these authorities, the late Chief Justice SMITH, in *Tiddy* v. *Harris, supra,* said: "But the practice has long prevailed, when the proofs are all in and the Judge intimates an opinion that under the old practice the plaintiff cannot recover, or, under the new, the testimony fails to establish the issues necessary to his having judgment, he may suffer nonsuit, and by appeal have the correctness of the ruling reviewed." This Court has repeatedly held that it is not necessary to plead specially the statute of limitations in order to show title by possession, but that it is included in the issue of ownership, though the title may depend entirely upon proof of possession for the statutory period *Freeman* v. *Sprague,* 82 N. C., 366. When the Judge declared his purpose to tell the jury that "no statute ran

against the defendants after Dale became insane," and had previously said in presence of the jury that " all of the evidence showed that John Dale had been insane since 1847 or 1849, and that there had been a possession under him on the lappage since 1847," when both propositions were disputed and put in doubt by more than a scintilla of testimony, as we have seen, it is difficult to distinguish the case where the Judge says in direct terms that the issue must be found for the defendant, from that where he states conclusions of fact and law that must inevitably lead to the same result. If John Dale was insane in 1847, when Queen entered on the lappage, and no statute ran against him after that time, the issue of title must of necessity have been found for the defendants if they exhibited an older title for the land or connected themselves with the elder grant.

We have not thus far adverted to the fact, however, that though the surveyor in his examination speaks of the Morgan grant as the defendants' grant, and though he describes a Derry Berry line and states that Dale's beginning corner was the same as that of the Morgan grant, there is absolutely no testimony tending to connect John Dale, the ancestor of the defendants, by a chain of title with the Morgan grant. True the Judge said, apparently after the cross-examination of the surveyor, and when no paper title had been offered by the defendants, that the Morgan or Dale grant seemed, according to all of the evidence, to cover the land in dispute, and plaintiff made no objection. If the defendants intended to insist upon the advantage of the elder title for the lappage, it was incumbent on them to connect themselves with the grant to Morgan, or show an older title, in some way, than that offered by plaintiff. In the absence of such proof, the Morgan grant serves the purpose of taking the right out of the State and opening the way to either party for showing title by continuous adverse possession under color for seven years, when the statute was running. We assume

that the Court below has sent up all the testimony, since the exception necessarily involves a review of all that was offered.   According to the record, the plaintiff was at liberty to rely on either grant to show possession out of the State. The proof of a counter possession, within the lappage of the two grants, on the part of the . defendants, could not be extended beyond their actual *possessio pedis* in the absence of testimony connecting them with the elder grant or an older title, so as to give them thereby a constructive possession superior to that which the law would otherwise give to the plaintiff to the outside boundary of the Ferree and Brittain deeds to Stacy, since they were proved by the surveyor to be coterminous with the Craige and Brittain grants.   In this view of the evidence, the *prima facie* proof of title in the plaintiff would be shown by all of the witnesses as to bound-ary.   The failure of the plaintiff's counsel to object when the Court stated a conclusion as to the facts not warranted by the testimony, would not supply the want of testimony not offered but necessary to sustain the contention of the defendants.   In this aspect of the evidence, even if Dale was insane prior to the entry of Queen in 1847, the defend-ants claiming under his heirs could only hold in the absence of paper title such portion of the land as was actually occu-pied by him for twenty years.   If they exhibited and located, so as to cover the disputed territory, an older title or con-nected him by an unbroken line with the elder grant, then only would the questions—first, as to the possession, and then as to the sanity of John Dale—arise; and when they arose, it would have been the province of the jury to pass upon them.

For the reasons given, we think that the Court below erred.   The judgment of nonsuit must be set aside and a new trial awarded.

Error.